IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| LOUISE PRINTZ , Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> RAYTHEON COMPANY, THOMAS A. KENNEDY, WILLIAM R. SPIVEY, STEPHEN J. HADLEY, TRACY A. ATKINSON, LETITIA A. LONG, GEORGE R. OLIVER, ROBERT E. BEAUCHAMP, DINESH C. PALIWAL, JAMES A. WINNEFELD, JR., ROBERT O. WORK, ADRIANE M. BROWN, MARTA R. STEWART, and ELLEN M. PAWLIKOWSKI, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. _____ <br><br> COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934 <br><br> JURY TRIAL DEMANDED |

Plaintiff, Louise Printz ("Plaintiff"), by and through her attorneys, alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

**NATURE OF THE ACTION**

1.      This action stems from a proposed transaction (the "Proposed Transaction" or "Merger") announced on June 9, 2019, pursuant to which Raytheon Company ("Raytheon" or the "Company") will be acquired by United Technologies Corporation ("UTC").

2.      On June 9, 2019, Raytheon's Board of Directors (the "Raytheon Board" or the "Individual Defendants") caused the Company to enter into an Agreement and Plan of Merger (the "Merger Agreement") with UTC and Light Merger Sub Corp., a wholly owned subsidiary of UTC, formed for the purpose of effecting the merger ("Merger Sub").  In accordance with the

Merger Agreement, Merger Sub will merge with and into Raytheon, leaving Raytheon as the surviving company in the merger as a direct, wholly owned subsidiary of UTC, with each share of Raytheon common stock being converted into 2.3348 fully paid and non-assessable shares of UTC common stock (and, where applicable, cash in lieu of fractional shares) ("Stock Consideration").  On completion of the Merger, UTC will be renamed Raytheon Technologies Corporation.

3.      On July 17, 2019, UTC filed a joint registration statement on Form S-4 (the "Proxy") with the United States Securities and Exchange Commission ("SEC").  As described herein, the Proxy omits certain material information with respect to the Proposed Transaction, which renders it false and misleading, in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R.  140.14a-9 ("Rule 14a-9") promulgated thereunder.

4.      Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Merger or, in the event the Merger is consummated, to recover damages resulting from Defendants' wrongdoing described herein.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act, 15 U.S.C § 78aa, and 28 U.S.C. § 1331, as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

6.      This Court has personal jurisdiction over all of the Defendants because each is either a corporation that conducts business within this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this

District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391 because Raytheon is incorporated in this District and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.      Plaintiff is, and has been at all times relevant hereto, the owner of Raytheon common stock.

9.      Defendant Raytheon is a Delaware corporation with its principal executive offices located in Waltham, Massachusetts.  Shares of Raytheon common stock are quoted on the New York Stock Exchange ("NYSE") under the symbol "RTN."

10.      Defendant Thomas Kennedy ("Kennedy") is Chairman of the Raytheon Board and Chief Executive Officer of the Company.

11.      Defendant William R. Spivey ("Spivey") is a director of the Company.

12.      Defendant Stephen J. Hadley ("Hadley") is a director of the Company.

13.      Defendant Tracy A. Atkinson ("Atkinson") is a director of the Company.

14.      Defendant Letitia A. Long ("Long") is a director of the Company.

15.      Defendant George R. Oliver ("Oliver") is a director of the Company.

16.      Defendant Robert E. Beauchamp ("Beauchamp") is a director of the Company.

17.      Defendant Dinesh C. Paliwal ("Paliwal") is a director of the Company.

18.      Defendant James A. Winnefeld, Jr.  ("Winnefeld") is a director of the Company.

19.      Defendant Robert O. Work ("Work") is a director of the Company.

20.      Defendant Adriane M. Brown ("Brown") is a director of the Company.

21.     Defendant Marta R. Stewart ("Stewart") is a director of the Company.

22.     Defendant Ellen M. Pawlikowski ("Pawlikowski") is a director of the Company.

23.     The defendants listed in ¶¶ 10-22 are collectively referred to herein as the "Individual Defendants."

24.     The Individual Defendants and Raytheon are referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

25.     According to the Company's March 2019 Form 10-K, Raytheon "is a technology and innovation leader specializing in defense and other government markets throughout the world." The Company "develop[s] technologically advanced and integrated products, services and solutions in…: integrated air and missile defense; electronic warfare; command, control, communications, computers, cyber, intelligence, surveillance and reconnaissance; space systems; effects; and cyber." *Id.*

26.     "UTC provides high technology products and services to the building systems and aerospace industries worldwide.  UTC conducts its business through four principal segments." Proxy at 13.

27.     According to UTC's February 2019 Form 10-K, "On November 26, 2018, the Company announced its intention to separate into three independent companies: (1) ["UTC RemainCo"], an aerospace company comprised of the Collins Aerospace Systems and Pratt & Whitney businesses [and all relevant subsidiaries ("the UTC aerospace businesses")], (2) Otis, and (3) Carrier." *Id.*  The relevant separation and distributions are expected to take place before the completion of the Merger; thus, the Merger will combine UTC RemainCo and Raytheon in an all-stock merger of equals.  Consequently, the "value of UTC common stock that Raytheon stockholders will receive in the merger will reflect the combination of [UTC RemainCo] and

Raytheon and will not include the value of the Otis business or the Carrier business. . . ."  Proxy at 42.  Under the terms of the Merger, Raytheon shareholders will receive 2.3348 shares of UTC RemanCo, representing 43% of the combined company.

28.    In soliciting shareholder approval for the Merger, Defendants caused the issuance of the Proxy, which purports to contain an overview of the Merger, but omits certain critical information, rendering portions of the Proxy materially incomplete and/or misleading, in violation of the Exchange Act provisions discussed herein.  As a result, Raytheon shareholders lack material information necessary to allow them to make an informed decision concerning whether or not to vote in favor of the Merger.

29.    Specifically, the Proxy contains materially incomplete or misleading information concerning (i) the financial analyses performed by Citigroup Global Markets Inc.  ("Citigroup"), a financial advisor for the Raytheon Board, in support of Citigroup's fairness opinion, (ii) the financial analyses performed by RBC Capital Markets, LLC ("RBC Capital"), another financial advisor for the Raytheon Board in support of RBC Capital's fairness opinion, (iii) the financial analyses performed by Morgan Stanley & Co.  LLC ("Morgan Stanley"), a financial advisor for UTC's Board of Directors (the "UTC Board"), in support of Morgan Stanley's fairness opinion, and (iv) the financial analyses performed by Evercore Group LLC ("Evercore"), another financial advisor for the UTC Board, in support of Evercore's financial opinion.

30.    The day before the Merger was announced, Raytheon closed at $187.19 per share. The day of the announcement, the Company's stock closed at $177.62.  Between the deal announcement and before the Proxy came out, Raytheon traded between $177.62 and $184.02 per share. The day the Proxy came out, Raytheon fell $2.16 per share and closed at $176.09 per share.  Since the Proxy was filed, Raytheon has traded between $178.57 and $192.63 per share.

Thus, the implied valuation of the transaction to Raytheon shareholders is, in many cases, less than the various valuation analysis of the financial advisors making the details of those analyses even more significant.

Material Omissions Concerning Citigroup's Fairness Opinion

31.     The Proxy omits material information concerning the opinion rendered by Citigroup, which determined that "the exchange ratio was fair, from a financial point of view, to the holders of Raytheon common stock."  Proxy at 94.

32.     *First,* the Proxy omits material information from Citigroup's *Selected Public Companies Analysis* of Raytheon.  "[T]hrough an analysis of the public valuation and trading multiples of similar publicly traded companies . . . judged to be sufficiently comparable to Raytheon and UTC" (Proxy at 97), Citigroup calculated "an adjusted equity value reference range for Raytheon of $49.7 billion to $57.3 billion with respect to calendar year 2019 [$178.78 - $205.75 on a per-share basis] and $52.7 billion to $63.5 billion with respect to calendar year 2020 [$189.23 - $228.01]."  Proxy at 98.

33.     However, the Proxy fails to disclose the metrics for each of the selected public companies that Citigroup reviewed in its analysis or the mean and median metrics for the group of companies.

34.     Likewise, despite the use of Price to Earnings per Share ("EPS") Multiples for the selected public companies in Citigroup's analysis, there is no disclosure of the 2019 and 2020 EPS for Raytheon.

35.     Further, the Proxy omits the same material information from Citigroup's *Selected Public Companies Analysis* of UTC RemainCo.  Again, it fails to disclose not only the EPS used

in Citigroup's analysis, but the metrics for each of the selected public companies analyzed, and the mean and median metrics for the group of companies.

36.     The Proxy provides that "in reaching its decision to approve the merger agreement and to recommend that Raytheon's stockholders vote '**FOR**' the Raytheon merger proposal, the Raytheon Board considered a variety of factors" (Proxy at 69) including the forecasted financial information.  For that reason, its complete and comprehensive disclosure is material to Raytheon's shareholders in deciding how to vote their shares.  It would allow Raytheon's shareholders to assess and better understand the prospective financial performance and viability of their investments and, thereby, make an informed decision concerning whether or not to vote in favor of the Merger.

37.     *Second*, the Proxy omits material information in connection with Citigroup's *Discounted Cash Flow ("DCF") Analyses* of Raytheon and UTC RemainCo.  Citigroup "calculat[ed] the present value of the estimated future unlevered free cash flows of [both Raytheon and UTC RemainCo] over the projection period and the terminal value of [both Raytheon and UTC RemainCo] at the end of the projection period."  Proxy at 100.  Citigroup's calculations "impl[ied] an adjusted equity value reference range for Raytheon of $54.6 billion to $78.9 billion [$196.05 - $283.30 per share]" (Proxy at 100) and "an equity value reference range for UTC RemainCo of $71.7 billion to $116.2 billion."  Proxy at 101.  However, the Proxy failed to disclose the line items Citigroup used to determine the free cash flow utilized in both *DCF Analyses* and, thus, provides a wholly insufficient description thereof, especially because the market trading since the announcement of the Merger has generally valued the deal to Raytheon shareholders below Citigroup's reference range.

38.     Likewise, there is no disclosure of the numeric inputs Citigroup used to calculate the discount rates cited in both analyses.

39.     *Third,* the Proxy omits material information in connection with Citigroup's analyses of *Analyst Targets.*  "For informational purposes, [Citigroup reviewed] publicly available research analysts' one-year forward price targets for Raytheon common stock" (Proxy at 102) and "publicly available research analysts' one-year forward firm value targets of UTC RemainCo."  *Id.*  Significantly, the Proxy fails to disclose all of the price targets for both Raytheon and UTC RemainCo, and the mean and median price targets for both companies.

40.     Nor does the Proxy disclose the numeric inputs used to calculate the discount rate used in Citigroup's analysis.

Material Omissions Concerning RBC Capital's Fairness Opinion

41.     Similarly, the Proxy omits material information concerning the opinion rendered by RBC Capital, which determined that "the exchange ratio provided for pursuant to the merger agreement was fair, from a financial point of view, to holders of Raytheon common stock." Proxy at 103.

42.     *First*, the Proxy omits material information concerning RBC Capital's *Selected Public Companies Analyses* of both Raytheon and UTC's aerospace businesses.  RBC Capital reviewed three companies it "considered generally relevant as publicly traded companies with operations in the defense industry" (Proxy at 107) and eight companies it "considered generally relevant as publicly traded companies with operations primarily in the aerospace and defense industries" (Proxy at 108).  Accordingly, RBC Capital calculated an "approximate implied per share equity value reference ranges for Raytheon based on calendar year 2019 and calendar year 2020 estimated [earnings before interest, taxes, depreciation, and amortization ("EBITDA")] of

$211.33 to $269.66 and $207.48 to $259.80 per share, respectively" (Proxy at 107), and "$62.12 to $110.02 and $61.71 to $109.40 per share" (Proxy at 108) for UTC RemainCo.

43.      The Proxy, however, failed to disclose the metrics for each of the companies that RBC Capital used in its analyses.

44.      The materiality of RBC Capital's fairness opinion as a factor to be considered prior to the vote is frequently touted throughout the Proxy.  In that regard, the financial information and valuation methods used to generate RBC Capital's analyses must also be fairly disclosed.  An incomplete disclosure "could create a misleading or incomplete view of [RBC Capital's] financial analyses" (Proxy at 106) to detrimental effect.

45.      *Second,* the Proxy omits material information from RBC Capital's *DCF Analyses*. "[RBC Capital] performed [DCF] analyses of Raytheon (on a consolidated basis) and the UTC aerospace businesses (on a sum-of-the-parts basis)."  Proxy at 108.

46.      However, the Proxy omits the line items RBC Capital used to determine the free cash flow utilized in its *DCF Analyses* and is deficient as a result.

47.      Moreover, RBC Capital's analysis of Raytheon took into account "a selected range of discount rates of 7.0% to 8.0% derived from a weighted average cost of capital calculation."  Proxy at 108.  Yet, there is no disclosure of the numeric inputs RBC Capital used to calculate these discount rates.  Furthermore, there was no disclosure of the basis for using the terminal value perpetuity growth rates.

48.      Likewise, the Proxy also fails to disclose the numeric inputs or the basis for using the terminal value perpetuity growth rates used in RBC Capital's DCF analysis of the UTC aerospace businesses.

49.     This information is particularly material since RBC Capital's *DCF Analyses* concluded that Raytheon's value was between $210.77 and $301.37 per share, significantly more than the market has placed on the value of the Merger to Raytheon shareholders.

50.     *Third,* the Proxy omits material information from RBC Capital's analysis of publicly available research analysts' forward stock price targets for Raytheon common stock. Notably, all the Proxy discloses is that the "price targets for Raytheon common stock, discounted to present value, . . . indicated a target stock price range for Raytheon common stock of $160.70 to $243.35 per share." Proxy at 110.  The Proxy fails to disclose, however, any of the price targets, or the low, mean, median, and high price targets of the analyzed group.

51.     Moreover, while the Proxy provides that the aforementioned price targets are "discounted to present value" (Proxy at 110), it fails to disclose the numeric inputs used to calculate the discount rate.

<u>Material Omissions Concerning Morgan Stanley's Fairness Opinion</u>

52.     *First*, the Proxy omits material information from Morgan Stanley's *Comparable Companies Analysis* of UTC RemainCo.  For the purpose of its analysis, "Morgan Stanley reviewed certain financial information, valuation multiples and market trading data relating to UTC RemainCo and selected publicly traded companies that Morgan Stanley believed, based on its professional judgement and experience with companies in the commercial aerospace industry, to be similar to UTC RemainCo. . . ." Proxy at 76.  Ultimately, Morgan Stanley "derive[d] a range of implied aggregate values of UTC RemainCo of approximately $125 to $171 billion." Proxy at 78.  However, Morgan failed to disclose UTC RemainCo's  next 12 months EPS.

53.     *Second,* the Proxy omits material information from Morgan Stanley's *Sum-Of-The-Parts Discounted Cash Flow Analysis* of UTC RemainCo.  The analysis was performed "to

provide insight into the value of [UTC RemainCo] as a function of its future cash flows and terminal value." Proxy at 76. Yet, the Proxy fails to disclose the line items Morgan Stanley used to determine the free cash flow used in the DCF Analysis.

54. Furthermore, there is no disclosure of the numeric inputs Morgan Stanley used to calculate the discount rates cited in its analysis.

55. *Third,* the Proxy omits material information from Morgan Stanley's *Comparable Companies Analysis* of Raytheon. Specifically, the Proxy fails to disclose Raytheon's calendar year 2019 EPS utilized by Morgan Stanley in its analysis.

56. *Fourth,* the Proxy omits material information from Morgan Stanley's *Discounted Equity Value Analysis* of Raytheon. With the intention of providing "insight into a theoretical estimate of the future implied value of a company's common equity as a function of such company's estimated future earnings and a theoretical range of trading multiples . . . Morgan Stanley performed an analysis of the implied present value of the future stock prices and dividend payments of Raytheon." Proxy at 80. However, the Proxy fails to disclose Raytheon's EPS and dividend projections (or particulars thereof) as used by Morgan Stanley in its analysis.

57. Furthermore, there is no disclosure of the numeric inputs Morgan Stanley used to calculate the discount rates cited in its analysis.

58. *Fifth,* the Proxy omits material information from Morgan Stanley's *DCF Analysis* of Raytheon. The Proxy fails to disclose the line items for the unlevered free cash flow Morgan Stanley calculated for "calendar years 2019 through 2023" (Proxy at 80) or those "relating to Raytheon's pension plans for calendar years 2019 through 2029." *Id.* Nor does the Proxy disclose Morgan Stanley's numeric inputs used to formulate the "range of discount rates from 6.3% to 7.7%" (*id.*), merely stating that the range was "selected by Morgan Stanley based on its

professional judgment and experience to reflect the WACC of Raytheon." *Id.* This information becomes all the more significant because Morgan Stanley's *DCF Analysis* valued Raytheon at $231 to $311 per share, significantly more than how the market has valued Raytheon since the announcement of the Merger.

59.     To the extent that Morgan Stanley used data derived from both *DCF Analyses* of UTC RemainCo and Raytheon in its *Relative Discounted Cash Flow Analysis,* the Proxy continues to omit information material to Raytheon's shareholders.

Material Omissions Concerning Evercore's Fairness Opinion

60.     *First*, the Proxy omits material information from Evercore's *Selected Public Company Trading Analyses* of both Raytheon and UTC RemainCo. Like in Morgan Stanley's analyses, the Proxy fails to disclose Raytheon or UTC RemainCo's 2019, despite Evercore using EPS in its analyses. Furthermore, the Proxy did not disclose the valuation metrics for each of the selected companies, or the low and high metrics of the selected companies as a group.

61.     *Second,* the Proxy omits material information from Evercore's *DCF Analyses* of both Raytheon and UTC RemainCo. Evercore's analyses accounted for each company's standalone unlevered, after-tax free cash flows in its calculations, the line items of which were not disclosed in the Proxy, thus preventing Raytheon's shareholders from making their own individual determination as to the reliability of this valuation. This information becomes all the more significant because Evercore's *DCF Analysis* valued Raytheon at $202 to $276 per share, significantly more than how the market has valued Raytheon since the announcement of the Merger.

62.     Whereas the Proxy specified that the discount rates used in Evercore's *DCF Analyses* were "based on . . . estimate[s] of UTC RemainCo's [and Raytheon's] weighted

average cost of capital" (Proxy at 90), there was no disclosure of the numeric inputs used to calculate the discount rates.

63.     *Third,* the Proxy omits material information from Evercore's *Illustrative Present Value of Future Share Price Analyses* of both Raytheon and UTC RemainCo.  The former "was designed to provide an indication of the present value of a theoretical future value of Raytheon as a function of Raytheon's estimated future cash flow and its assumed multiple of equity value to NTM free cash flow."  Proxy at 91.  The latter "was designed to provide an indication of the present value of a theoretical future value of UTC RemainCo as a function of UTC RemainCo's estimated future cash flow and its assumed multiple of equity value to NTM free cash flow."  *Id.* Significantly, with regard to both analyses, the Proxy fails to disclose: (i) any line item detail for the free cash flow valuations used in Evercore's analyses; (ii) the aggregate amount of estimated dividends to be paid by Raytheon and UTC RemainCo in the future; and (iii) the numeric inputs used by Evercore to calculate the discount rates used in its analyses.

64.     *Fourth,* the Proxy omits material information from Evercore's *Equity Research Analyst Price Targets* of both Raytheon and UTC RemainCo.  For informational purposes, Evercore reviewed and analyzed: (i) "selected public market trading price targets for the shares of Raytheon common stock prepared and published by equity research analysts . . . [reflecting] analysts' estimates of the future public market trading price of the shares of Raytheon common stock at the time the price target was published" (Proxy at 92), and (ii) "selected valuation estimates for UTC on a sum of the parts basis giving effect to the separation and the distributions, prepared and published by equity research analysts for UTC for either fiscal year 2019 or 2020 . . . [reflecting] analysts' estimates of the valuation and trading multiples of UTC RemainCo at the time the report was published."  *Id.*  Not only does the Proxy fail to disclose all of the public

market trading price targets and the estimates of the valuation and trading multiples factored into Evercore's analyses, but it fails to disclose the mean and median price targets of Raytheon common stock, as well as those of the trading multiples of UTC RemainCo.

65. Nor does it disclose the numeric inputs used to calculate the discount rate used in Evercore's analysis of the equity research analysts' price targets for Raytheon shares.

66. *Fifth,* the Proxy omits material information from Evercore's *Contribution Analysis.* Again, for informational purposes, "Evercore analyzed the respective implied relative equity contributions of Raytheon and UTC RemainCo to the combined company." Proxy at 92. Yet, the Proxy fails to disclose the net income for both Raytheon and UTC RemainCo.

67. Likewise, Evercore's *Contribution Analysis* was based in part on the DCF valuation derived from its aforementioned *DCF Analyses*, and the present value of the future stock prices of both UTC RemainCo and Raytheon as calculated in its *Illustrative Present Value of Future Share Price Analyses.* Accordingly, the *Contribution Analysis* as laid out in the Proxy shares the same inadequacies.

68. *Sixth,* the Proxy omits material information from Evercore's *Pro Forma "Has-Gets" Analysis.* For informational purposes, Evercore analyzed "the implied aggregate equity value of UTC RemainCo attributable to UTC shareowners on a pro forma basis giving effect to the merger based on a [DCF] analysis . . . [which] resulted in an implied incremental aggregate equity value of UTC RemainCo on a pro forma basis attributable to UTC shareowners of approximately $2.9 billion." Proxy at 93. Again, Evercore's analysis was based in part on the DCF valuation indicated in its aforementioned DCF Analyses. As a result, the Proxy suffers from the same shortcomings.

69.     Given that each shareholder of Raytheon common stock will have the right to receive 2.3348 fully paid and non-assessable shares of UTC RemainCo common stock (and, where applicable, cash in lieu of fractional shares) following the effective time of the Merger, financial analyses as to the present and prospective values of the common stocks of Raytheon, UTC, and UTC RemainCo would be material information necessary to allow Raytheon shareholders to evaluate the fairness of the Stock Consideration, and to make an informed decision concerning whether or not to vote in favor of the Merger.

70.     Further, the non-disclosed information discussed above prevents shareholders from understanding the context of Evercore's valuations or considering the potentially anomalous nature of the inputs thereto or the ranges derived therefrom.  It is well established that the real informative value of a financial advisor's work is not in its conclusion, but in the valuation analyses that buttress that result.  Absent this information, Raytheon shareholders are unable to determine whether the Proposed Transaction is indeed fair and in their best interest.

71.     Based on the foregoing disclosure deficiencies in the Proxy, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Raytheon stockholders will suffer, absent judicial intervention.

## CLASS ACTION ALLEGATIONS

72.     Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Raytheon (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

73.     This action is properly maintainable as a class action for the following reasons:

a.       The Class is so numerous that joinder of all members is impracticable.  As of July 17, 2019, there were over 281,422,458 shares of Raytheon common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

b.       Questions of law and fact are common to the Class, including, among others: (i) whether Defendants have violated Sections 14(a) and 20(a) of the Exchange Act in connection with the Proposed Transaction; and (ii) whether Plaintiff and the Class would be irreparably harmed if the Proposed Transaction is consummated as currently contemplated and pursuant to the Proxy as currently composed.

c.       Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

d.       Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

e.       The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

f.       A class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

g.       Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, preliminary and final injunctive relief on behalf of the Class as a whole is entirely appropriate.

**CAUSES OF ACTION**

<u>**COUNT I**</u>
**Claim for Violation of Section 14(a) of the Exchange Act**
**and Rule 14a-9 Promulgated Thereunder**
**(Against All Defendants)**

74.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

75.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person…to solicit or to permit the use of his name to solicit any Proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

76.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that solicitation communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a).

77.     Rule 14a-9 further provides that, "[t]he fact that a Proxy statement, form of Proxy or other soliciting material has been filed with or examined by the Commission shall not be deemed a finding by the Commission that such material is accurate or complete or not false or misleading, or that the Commission has passed upon the merits of or approved any statement contained therein or any matter to be acted upon by security holders. No representation contrary to the foregoing shall be made." 17 C.F.R. § 240.14a-9(b).

78.     As discussed herein, the Proxy misrepresents and/or omits material facts concerning the Merger.

79.     Defendants prepared, reviewed, and caused the filing and dissemination of the false and misleading Proxy to Raytheon shareholders.  In doing so, Defendants knew or recklessly disregarded that the Proxy failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

80.     The omissions and incomplete and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote their shares.  In addition, a reasonable investor would view such information as altering the "total mix" of information made available to shareholders.

81.     By virtue of their positions within the Company and/or roles in the process and in the preparation of the Proxy, Defendants were undoubtedly aware of this information and had previously reviewed it, including participating in the Merger negotiation and sales process and reviewing Citigroup's, RBC Capital's, Morgan Stanley's and Evercore's complete financial analyses purportedly summarized in the Proxy.

82.     The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Merger.

83.     Raytheon is deemed liable as a result of the Individual Defendants' negligence and/or recklessness in preparing and reviewing the Proxy.

84.     Defendants knew that Plaintiff and the other members of the Class would rely upon the Proxy in determining whether to vote in favor of the Merger.

85.     As a direct and proximate result of Defendants' unlawful course of conduct in violation of Section 14(a) of the Exchange Act and Rule 14d-9, absent injunctive relief from the Court, Plaintiff and the other members of the Class will suffer irreparable injury by being denied

the opportunity make an informed decision concerning whether or not to vote in favor of the Merger or exercise their appraisal rights.

86.     Plaintiff and the Class have no adequate remedy at law.

## COUNT II
### Claim for Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

87.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

88.     The Individual Defendants acted as controlling persons of Raytheon within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Raytheon, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

89.     Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

90.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.   The Proxy contains the unanimous

recommendation of each of the Individual Defendants to approve the Merger.  They were thus directly connected with and involved in the making of the Proxy.

91.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the Exchange Act and Rule 14d-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons and the acts described herein, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

92.     As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

93.     Plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class Representative and Plaintiff's counsel as Class Counsel;

B.     Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C.     Directing the Individual Defendants to disseminate an Amendment to the Company's Proxy that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.     Directing Defendants to account to Plaintiff and the Class for their damages sustained because of the wrongs complained of herein;

E.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: July 30, 2019                          **RIGRODSKY & LONG, P.A.**

                                              By:  _/s/ Gina M. Serra_
**OF COUNSEL:**                                    Brian D. Long (#4347)
                                                  Gina M. Serra (#5387)
**WOLF POPPER LLP**                               300 Delaware Avenue, Suite 1220
Carl L.  Stine                                    Wilmington, DE 19801
Antoinette Adesanya                               Telephone: (302) 295-5310
845 Third Avenue                                  Facsimile: (302) 654-7530
New York, New York 10022                          Email: bdl@rl-legal.com
Tel.:  212-759-4600                               Email: gms@rl-legal.com
Fax:  212-486-2093
Email: cstine@wolfpopper.com                      *Attorneys for Plaintiff*